UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:12-CR-00057-D-4

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM IN SUPPORT OF |
| | ) | DEFENDANT'S PRO SE MOTION |
| KWAMANE EVERETT, | ) | FOR COMPASSIONATE RELEASE |
| | ) | |
| Defendant. | ) | |

Mr. Kwamane Everett, by and through undersigned counsel, respectfully moves this Honorable Court to grant his Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by his immediate vulnerability for serious complications due to his dire susceptibility to COVID-19 given his pre-diabetes and more importantly for him his need to care for his infirmed mother still recovering from COVID-19 and his need to care for his two children. He and his circumstances perfectly fit within former United States Attorney General Barr's qualifications for home confinement because of the COVID-19 pandemic. Moreover, the 18 USC § 3553(a) sentencing factors strongly weigh in favor of a sentence reduction for Mr. Everett. Additionally, Mr. Everett has properly exhausted his administrative remedies by filing his release request with the warden at FCI Williamsburg, which was denied. *United States v. Barnes,* Crim. No. 5:18-CR-347-BO-1 (E.D.N.C. January 16, 2021) (finding that during the pandemic the typical administrative processes can be waived: discussed further at infra. at 5-6). *See*

1

**Exhibit A**: Correspondence with Mr. Everett (email from 1/9/21 mentioning submitted bp-8, and letter from 11/20/20) [1].

Mr. Everett suffers from pre-diabetes. *See* **Exhibit B**: Medical Records at 3. According to the Institute for Respiratory Health, "by far and away, the most common illnesses linked to the development of serious disease in COVID-19 patients across [Great Britain, China, and the USA] have been *diabetes*, high blood pressure, and obesity. *See COVID-19 and People with Pre-Existing Lung Conditions*: (https://www.resphealth.org.au/coronavirus/covid-19-and-people-with-pre-existing-lung-conditions/) (last accessed March 16, 2021) (emphasis added). Mr. Everett is in custody at FCI Williamsburg where the detained population is over 1470 total inmates, according to the Federal Bureau of Prisons. *See Federal Bureau of Prisons: FCI Williamsburg* https://www.bop.gov/locations/institutions/edg (last accessed June 1, 2021). Staff members and inmates have already been infected with COVID-19 at FCI Williamsburg at higher rates than the general population. (*See* https://www.bop.gov/coronavirus/ wherein the public is provided a "snap shot" of one time, which clearly is subject to deteriorating conditions and an increasing hazard of airborne disease from moment to moment.) 196 inmates have tested positive for COVID-19, 70 staff members have tested positive, and 4 inmates have died. *See* https://www.bop.gov/coronavirus/ (last accessed June 1, 2021). These are very alarming statistics, and in such circumstances it is exceedingly likely Mr. Everett will contract the coronavirus. If he does contract COVID-19, the virus will likely

---

[1] Upon receiving any further verification of Mr. Everett's administrative remedies process, undersigned will submit that information in a supplemental filing.

2

significantly impact his life by attacking his central nervous system, respiratory system, etc, or hurt him even worse. This type of punishment which consists of him having to be detained (whether it be during these times or otherwise) does not fit the crime anymore; in other words, it is certainly greater than necessary. 18 USC § 3553(a).

Conditions like those at FCI Williamsburg are what prompted former attorney general William Barr to issue two memorandums (one on March 26, 2020, the other on April 3, 2020) expanding consideration for transfers to home confinement to aid the BOP and the American public in moving past the COVID-19 pandemic. The April 3rd memorandum states in relevant part:

> Inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which covid-19 is materially affecting their operations… I therefore authorize the BOP to transfer to home confinement even if electronic monitoring is not available, so long as the BOP determines in every such instance that doing so is consistent and appropriate with our obligation to protect public safety.

*See **Exhibit C:*** Memorandums from Attorney General Barr, *April 3 Memorandum,* at 2.

Adding to the concern around Mr. Everett's incarceration during these perilous times, a National Commission on COVID-19 and Criminal Justice report released in September 2020 on the impact of COVID-19 in U.S. State and Federal Prisons indicated that the COVID-19 mortality rate within prisons is twice as high as the general population's morality rate, and the rate of COVID-19 infections is over four times as high as the general population. *See Schnepel, Kevin T.* COVID-19 in U.S.

State and Federal Prisons. Washington, D.C.: Council on Criminal Justice (September 2020). New outbreaks of COVID-19 have increased rapidly in recent months, with the highest worldwide number of new infections occurring as recently as April 26, 2021 (with 5.7 million new infections worldwide). *See WHO Coronavirus Dashboard:* https://covid19.who.int/ (last accessed May 27, 2021). This is particularly concerning when the United States has the largest incarcerated population in the world at about two million detainees. The mortality rate for Black Americans with COVID-19 is twice that of white Americans and Black Americans are incarcerated five times more often than white Americans. *See Schnepel, Kevin T.* COVID-19 in U.S. State and Federal Prisons. Washington, D.C.: Council on Criminal Justice (September 2020). A key finding from the report was that the highest COVID-19 mortality rates were observed "within large prisons…" *Id.* Mr. Everett is an African-American detained at FCI Williamsburg, which is a large prison already having to provide extensive medical care to many inmates with COVID-19. Therefore, considering all factors in this case, he is at a very high risk of contracting COVID-19, presenting extraordinary and compelling reasons for compassionate release.

As most judges from the Eastern District of North Carolina have granted such Compassionate Release Requests where it is appropriate to show this type of legally-sanctioned mercy, it is respectfully requested that this Honorable Court also issue an order reducing Mr. Everett's sentence to time served and/or home confinement given that it is appropriate to do so in Mr. Everett's immediate case as well. For example, see *United States v. Sudduth*, Crim. No. 5:14-CR-224-BO-1 (E.D.N.C. January 15,

2021) (finding obesity and the COVID-19 pandemic rise to the level of extraordinary and compelling circumstances, contributing to a granting of Sudduth's motion for compassionate release).

## STATEMENT OF FACTS

On April 10, 2012, Kwamane Everett was named in a three-count indictment filed in the Eastern District of North Carolina in front of Honorable District Court Judge James C. Dever. [D.E. 4]. On August 18, 2014, Mr. Everett pled guilty to counts 1 and 2 of the indictment, interference with commerce by robbery and aiding and abetting in violation of 18 U.S.C. §§ 1951 and 2 for count 1, and using or carrying a short barreled firearm during and in relation to a crime of violence and aiding and abetting in violation of 18 U.S.C. §924(c). [D.E. 121]; PSR ¶ 1.On June 12, 2012, The Honorable Judge James C. Dever entered his judgement regarding Mr. Everett, sentencing him to 37 months on count 1 and 77 months on count to, to be run consecutive, resulting in a total active prison term of 114 months, followed by 3 years of supervised release on each count, run concurrently [D.E. 159]. Mr. Everett's projected release date is May September 5, 2022. https://www.bop.gov/inmateloc/.

Moreover, it is respectfully submitted that this Honorable Court find that Mr. Everett has satisfactorily pursued his administrative remedies given that all matters have been completed as required by 18 U.S.C. § 3582(c)(1)(A). As the Honorable District Court Judge Boyle explained in a recent decision:

> Even assuming that defendant did not exhaust his administrative remedies, Section 3582(c)'s exhaustion requirement may be waived under the following circumstances: (1) the relief sought would be futile upon exhaustion; (2) exhaustion via the agency review process would

result in inadequate relief; or (3) pursuit of agency review would subject the petitioner to undue prejudice. A number of courts have found that the COVID-19 pandemic implicates the foregoing circumstances. E.g., *United States v. Pomante*, No. 19-20316, 2020 WL 2513095, at \*3-4 (E.D. Mich. May 15, 2020); *United States v. Zukerman*, No. 16 CR. 194, 2020 WL 1659880, at \*2-3 (S.D.N.Y. Apr. 3, 2020). Given the exigencies created by COVID-19, the Court finds that exhaustion would be both futile and potentially subject defendant to undue prejudice.

*United States v. Barnes,* Crim. No. 5:18-CR-347-BO-1 (E.D. N.C. January 16, 2021). Accordingly, it is respectfully submitted that it is appropriate under these urgent circumstances for this Honorable Court not to strictly construe the administrative exhaustion requirement in the case sub judice and as such, find that he has in fact exhausted his administrative remedies.

## BACKGROUND

Congress first enacted 18 U.S.C. § 3582(c)(1) as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" for judges to assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983). "This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on an individual no longer served legislative objectives." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at \* 5 (S.D.N.Y. Apr. 6, 2020).

The compassionate release statute empowered courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction."

6

18 U.S.C. § 3582(c)(1)(A)(i). Congress delegated to the U.S. Sentencing Commission the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). It was not until 2007, more than two decades after the statute was enacted, that the Commission responded. It issued a guideline stating that "extraordinary and compelling reasons" include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A)-(D).

Mr. Everett is an African-American suffering from pre-diabetes, incarcerated in a large American prison, and therefore extremely vulnerable to contracting COVID-19 and suffering severe complications. His mother is also still recovering from COVID-19, is in overall poor health, and is therefore extremely limited in her ability to care for Mr. Everett's eleven year old son and eight year old daughter. *See **Exhibit A:** Correspondence with Mr. Everett. Moreover, the mother of his children suffers from a disease which limits her ability to care for Mr. Everett's children. *Id*. There are also strong grounds for reducing his sentence based on the § 3553(a) sentencing factors.

Ultimately, Mr. Everett's request for compassionate release qualifies under the guidelines as "extraordinary and compelling" reasons under Application Note 1(D) to Guidelines Section 1B1.13. This Application Note created a catch-all provision for when the Director of the BOP determines "there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." § 1B1.13 app. n.1(D).

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the BOP, who adopted a program statement governing compassionate release that in many ways narrowed the criteria established by the Commission. *See* BOP Program Statement 5050.49. During the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. The Office of the Inspector General for the Department of Justice concluded in 2013 that "[t]he BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, available at https://oig.justice.gov/reports/2013/e1306.pdf; *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/_reports/2015/e1505.pdf ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population…", decades of denying such Compassionate Release Reduction Requests are imprinted in its long standing history); U.S.S.G. § 1B1.13, app. n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates). Heeding this criticism, Congress acted.

8

The title of Section 603(b) of the First Step Act—"Increasing the Use and Transparency of Compassionate Release"—leaves no doubt as to Congress' intent in modifying 18 U.S.C. § 3582(c)(1)(A). Through the First Step Act, enacted December 21, 2018, Congress sought to resuscitate compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). "[U]nder the amended statute, a court may conduct such a review also 'upon motion of the defendant,' if the defendant has exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has lapsed 'from the receipt of such a request by the warden of the defendant's facility,' whichever is earlier." *United States v. Decator*, No. CCB-95-0202, 2020 WL 1676219 (D. Md. Apr. 6, 2020) (*quoting* 18 U.S.C. § 3582(c)(1)(A)(i); Pub. L. 115-391, Title VI, § 603(b), Dec. 21, 2018, 132 Stat. 5239), *appealed by the government*.  In other words, "a prisoner must exhaust the administrative appeal process, or wait 30 days, before his claim may be considered" by the court.  *United States v. Underwood*, No. TDC-18-0201, 2020 WL 1820092, at *2 (D. Md. Apr. 10, 2020) (citing cases).

## ARGUMENT

Mr. Everett's medical conditions make him extremely vulnerable to serious complications or worse if he were to contract COVID-19. His mother is also in very poor health and needs his assistance with her care. She is also not in good condition to continue to care for his two children, and the children's mother also has a disease limiting her abilities as a caregiver. Moreover, a balancing of the § 3553(a) factors

9

with the risks Mr. Everett faces during this pandemic and otherwise, particularly the fact that he has already served over 75% of his sentence, shows that he qualifies for such relief.

### A. This Honorable Court has the authority to determine that Mr. Everett's vulnerability to COVID-19 does in fact constitute an "Extraordinary and Compelling Reason" for a sentence reduction.

Many federal judges across the country are properly holding that they have the authority to define "extraordinary and compelling reasons" for release under § 1B1.13 app. n. 1(D) and that the risks associated with COVID-19 can constitute an "extraordinary and compelling reason" for a sentence reduction. *United States v. Brooker (Zullo)*, No. 19-3218, 2020 WL 5739712 (2d Cir. Sept. 25, 2020). Courts have used their wise and appropriate discretion to provide defendants with relief under § 3582(c)(1)(A) "even when their circumstances do not fit squarely within the current policy statement of the Sentencing Commission as reflected in U.S.S.G. §1B1.13." *United States v. Alexander Salabrarria*, Crim. No. 7:00-CR-95-1-BO, ECF No. 125, page 5 (E.D.N.C. April 14, 2020), citing *United States v. Mauma*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *4 (D. Utah Feb. 18, 2020) (listing cases holding same). "Thus, while an applicable policy statement 'provides helpful guidance, it does not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction." *United States v. Norris*, F. Supp. 3d 383, 386 (E.D.N.C. 2020) (quoting *United States v. Beck*, 425 F. Supp. 3d 573, 581 – 82 (M.D.N.C. 2019).

Judges in districts throughout the United States have recognized that, at least for certain defendants, COVID-19 presents "extraordinary and compelling reasons" warranting a reduction in their sentences under the compassionate release statute. They vary from individual to individual, which is to be expected, but a common thread attaches them all; that is, the need for an individual, who is also an inmate, to be treated humanely within our federal criminal justice system. This concept is so simple and true, and should not be ignored. Thankfully, many of the Honorable United States District Courts across this country have begun to change this.

One notable decision from a Federal District Court comes from the Southern District of Mississippi, where the court granted a motion for compassionate release to an inmate much healthier than Mr. Everett in a prison with conditions better than those at FCI Williamsburg. At the time the opinion was written, seven (7) inmates had died, but only thirty-three (33) inmates, or slightly less than 4% of the inmate population, had tested positive for COVID-19. See *United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241, at 10-11 (S.D. Miss. May 1, 2020). The Court ultimately granted the young man's compassionate release motion because "it has become increasingly apparent that the BOP has failed to control the outbreak at Oakdale I. ... Given the ... apparent continued spread of the disease at Oakdale I, COVID-19 creates an 'extraordinary and compelling reason' potentially warranting a reduced sentence." Moreover, while some courts have held that the pandemic itself no longer amounts to an "extraordinary and compelling" circumstance, there is plenty

11

of reason to believe the world, and particularly the U.S. prison system, is far from being past the dangers of the pandemic, even with the advent of the vaccine.

The reason the COVID-19 vaccine is not itself enough for believing the pandemic is no longer an "extraordinary and compelling circumstance" is twofold. First, the effectiveness of the vaccine is greatly diminished in prison facilities. Second, it is still unclear if and when the vaccine is going to move America past the pandemic, so decarceration, even if used with vaccine distribution, remains the best strategy for ensuring the safety of inmates.

Regarding the effectiveness of vaccines in prison facilities, one study in November of 2020 by David Patieli and colleagues at HealthAffairs.org has shown that even a highly efficacious vaccine will have suboptimal preventive effects in high-spread, congregate settings. According to the study,

> a vaccine with low efficacy (e.g., 25%) can have a powerful preventive effect in areas where the effective reproduction number of the virus is low (e.g., Rt=1.5). By contrast, a vaccine with much higher efficacy (e.g., 75%) can nonetheless fail to prevent a large proportion of severe cases and deaths when deployed in areas where the effective reproduction number is high (e.g., Rt=2.1)

*See Health Affairs: Clinical Outcomes of a COVID-19 Vaccine: Implementation over Efficacy* (https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.02054) (last accessed April 19, 2021). This study's findings are particularly concerning when considered alongside the findings of Lisa Puglisi and her colleagues in an article for the Annals of Epidemiology from January of this year. Puglisi's study found the SARS-CoV-2 basic reproduction number in a large urban U.S. jail *to be 8.44* — the highest known basic reproduction number in any context in the world, and over four

12

times the basic reproduction value that Patieli's study said an effective (e.g. 75% immunity) could handle (i.e., greatly minimize serious cases and deaths). *See Annals of Epidemiology: Estimation of COVID-19 basic reproduction ratio in a large urban jail in the United States* (https://www.sciencedirect.com/science/article/abs/pii/S1047279720303471) (last accessed April 19, 2021).

Granted this study focused on large urban jails instead of BOP facilities, but such a high basic reproduction number is consistent with infection rates in United States prisons, which remain the highest of any place in the world. Multiple sources indicate that roughly 39% of United States prisoners have had or currently have COVID-19, a far higher infection rate than the worldwide average (2%) and the United States (9%). *See The New York Times: COVID-19: Infections Among U.S. Prisoners Have Been Triple Those of Other Americans* (https://www.nytimes.com/live/2021/04/10/world/covid-vaccine-coronavirus-cases) (citing the Marshall project, U.C.L.A. Law, and Covid Prison Project for the figures) (last accessed April 12, 2021). From this and other studies, it is clear that transmission dynamics in many jails and prisons create such a high base reproduction rate for COVID-19 that the effectiveness of even a highly effective vaccine is considerably diminished.

Consequently, the vaccine alone cannot quickly and easily resolve the COVID-19 pandemic in American prisons and the wider American population. In the midst of this ongoing crisis, the solution to minimizing the rapid spread of COVID-19 in,

13

through, and out of BOP facilities is simple: reduce the incarcerated populations. [2]

Recent studies have further confirmed this as a primary strategy for overcoming

COVID-19, and that doing so is not an inherent threat to public safety. The National

Commission on COVID-19 and Criminal Justice conducted an extensive study on re-

booking rates from March to September of 2020 when COVID protocols began to take

effect. In sum, after evaluating data from 375 jails around the country, the study

found that, although those released from jails during the early pandemic were more

likely to have been booked on felony charges and to have served longer periods of

detention than those released prior to the pandemic, 30, 60, and 90 day rebooking

rates during the early pandemic remained below pre-pandemic levels. *See National*

*Commission on COVID-19 and Criminal Justice: COVID-19, Jails, and Public Safety:*

(https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/covid-

19,_jails,_and_public_.pdf) (last accessed April 12, 2021).

More specifically regarding the reduction of the spread of COVID-19 within

carceral facilities, one study showed that a 9% reduction in the carceral population

was associated with a 56% decrease in transmission. Further depopulation,

ultimately reaching a population decrease of 25%, was associated with ongoing

---

[2]   For example, on March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable inmates who have already served a majority of their sentence. *See https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf*.   The same day, dozens of public health experts made a similar request, asking the President to commute the sentences of elderly inmates, noting they are at the highest risk of dying from the disease and pose the smallest risks to public safety. *See https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf*.

reductions in transmission. The investigators concluded that decarceration should be "a primary strategy for Covid-19 mitigation in jails." *See The Effectiveness of interventions to reduce COVID-19 transmission in a large urban jail* (https://www.medrxiv.org/content/10.1101/2020.06.16.20133280v1) (last accessed April 12, 2021). Another study evaluating the Texas state prison system comes to the same conclusion. *See Journal of Urban Health: Prison Propulation Reductions and COVID-19: A Latent Profile Analysis Synthesizing Recent Evidence from the Texas State Prison System* (https://link.springer.com/article/10.1007%2Fs11524-020-00504-z.) (last accessed April 12, 2021).

As a final point regarding the current state of the COVID-19 pandemic, despite the ongoing implementation of the vaccine, the virus continues to spread at a rapid pace, particularly because of the Delta variant. *See WHO Coronavirus Dashboard* (https://covid19.who.int/) (showing new infection rates in July that had not been seen since February due to the highly contagious Delta variant) (last accessed August 3, 2021). Moreover, while experts feel comfortable that current vaccines should be effective against one of the new variants of the virus, the effectiveness of the vaccines against other variants of concern is so unknown it is "producing a paper every day." *See National Public Radio: Can Vaccines Stop Variants? Here's What We Know So Far* (https://www.npr.org/sections/goatsandsoda/2021/04/09/985745837/can-vaccines-stop-variants-heres-what-we-know-so-far) (last accessed April 12, 2021). The reality is that despite the advent of the vaccine, the situation is just as if not even more dangerous for prisoners now as it was at the onset of the pandemic. Ultimately, the

15

dangers Mr. Everett faces of contracting the virus, particularly given his pre-diabetes, remain just as extraordinary and compelling now as they were one year ago.

There is no question that Section 603(b) of the First Step Act fundamentally changed the role of courts in the compassionate release process, vesting them with the authority to determine what constitutes extraordinary and compelling reasons for release. This frightening pandemic, as dangerous now as it ever has been, is an extraordinary and compelling circumstance, particularly for someone with Mr. Everett's medical conditions.

## B. Mr. Everett's Need to Care for His Infirmed Mother During the COVID19 Pandemic Presents an "Extraordinary and Compelling" Reason Warranting a Reduction in Sentence.

In addition to the "extraordinary and compelling" reasons for a reduction in Mr. Everett's sentence based on the threat of complications caused by COVID-19, another "extraordinary and compelling" reason is that Mr. Everett needs to be able to care and provide for his infirmed mother and two children during the pandemic.

Although care for an infirmed parent, or care for children who have someone who has some physical capacity to care for them, is not an explicitly enumerated "extraordinary and compelling" reason for a reduction in sentence in § 1B1.13, as discussed earlier, application note 1 (D) of the Commission guidelines provide a catchall "extraordinary and compelling" reason provision. Looking to this catchall provision, a recent opinion from the Southern District of New York explained a recent expansion of the standard for family circumstances that merit compassionate release:

> The animating principle of the Family Circumstances category is that there exists an extraordinary and compelling reason for release when

the defendant has a close family member who is completely unable to care for himself or herself and for when the defendant would be the only available care giver… This Court sees no reason to discount this unique role simply because the incapacitated family member is a parent and not a spouse.

*United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020). A decision out of the district of Massachusetts applied this standard, ruling that caring for a family member not enumerated in § 1B1.13, cmt. n.1(C), such as a parent, is an extraordinary and compelling reason if the defendant is the "only available caregiver." *United States v. Bucci*, 409 F. Supp. 3d 1, 2. (finding that because the defendant was "the only available caregiver" for his mother). Moreover, this standard can apply to Mr. Everett's children as they too are "close family members," and as mentioned, his mother and the children's mother both have serious health problems that limit their abilities as caregivers. Without a proper caregiver, it stands to reason that Mr. Everett is the "only available caregiver" to his children.

Considering this rationale alongside the discussion in Part A helps demonstrate that although caring for a parent or a child with a caregiver who is somewhat physically capable is not a specifically enumerated family circumstance, after the passage of the First Step Act, this Court is well within its authority to determine when the facts of a case qualify a non-enumerated family circumstance as an extraordinary and compelling reason for relief.

Here, Mr. Everett needs to take care of his mother because of the heightened risk of her experiencing severe complications from COVID-19 due to the fact that she is still struggling to recover from her COVID infection in December of 2020. His

17

mother's recovery has been so difficult she had to quit her job because of her physical struggles from the virus. *See* **Exhibit D:** Character Letters. Physically unable to perform her job, it is surely exceedingly difficult for her to care for an eleven-year old boy and eight-year old girl. Additionally, as mentioned earlier, the mother of Mr. Everett's children is not caring for the children because she has a physical disease that severely limits her ability to do so. This is truly a unique and dire circumstances which by His Grace should warrant compassionate release on its own.

Mr. Everett's mother's need for safe care, aid in caring for Mr. Everett's children, compounded by the children's mother's inability to truly help, is a very "extraordinary and compelling" reason for relief in any common understanding of the words. *E.g. United States v. Richardson*, No. 5:18-CR507-LFL, 2020 WL 2200853 at *2 (E.D.N.C. May 6, 2020) ("The statute does not define "extraordinary and compelling reasons" and the United States Court of Appeals for the Fourth Circuit has not previously interpreted this phrase. The court therefore interprets the terms "as taking their ordinary, contemporary, common meaning." (citations omitted)). This "extraordinary and compelling" reason when taken into consideration with the § 3553(a) discussed below, warrants the relief provided by the compassionate release statute.

## C. The Relevant § 3553(a) Sentencing Factors Warrant Reducing Mr. Everett's Sentence to Time Served / Adding a Period of Home Confinement as a Condition of Supervised Release.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must

consider the relevant sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, considering the Section 3553(a) sentencing factors alongside Mr. Everett's health issues and the health issues of those caring for his children, warrants immediate relief.

The court shall impose a sentence that is sufficient but "not greater than necessary" to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a)(2)(A)-(D). "[A]lthough defendant's federal sentence may have been appropriate at the time it was imposed, the Court's analysis is different in current circumstances. *United States v. Lee*, 2020 WL 3422772, at *5 (E.D. Va. June 22, 2020); *United States v. Mel*, 2020 WL 2041674 at *3 (D. Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").

Any further detention of Mr. Everett during this time would be to continue a sentence that is greater than necessary, particularly when "prisons now are even more dangerous than we typically accept." *United States v. Brown,* No. 4:05-CR-00227-1, 2020 WL 2091802, at *2 (S.D. Iowa Apr. 29, 2020). Moreover, Mr. Everett has already served roughly 90 months of his 114 month sentence, coming to 78% of

his total sentence term. This reflects the seriousness of the offense, but also, as is discussed below, demonstrates how Mr. Everett has spent ample time incarcerated to better himself and become a productive, responsible member of society upon his release.

Further deterring any future criminal conduct, Mr. Everett has a clear release plan. Upon release he will be residing with his mother at 3215 Sumner Place, Apt. 2 in Greenville NC. He also already has a job lined up. He will be working at insource performance under Larry Lee, and provided undersigned with a contact number for the position. Mr. Everett also received numerous letters of support for his compassionate release, all attesting to his good character, his remorse for his mistakes, and that he is hoping to be more involved in his children's lives. *See* **Exhibit D:** Character Letters. He also has received no infractions over the past six years he's been incarcerated at FCI Williamsburg, further speaking to his good character. *See* **Exhibit E:** Certificates.

Mr. Everett has also been devoted to his rehabilitation. He has completed at least 22 classes while incarcerated, and has obtained his GED. The classes he has completed cover a wide variety of practical and professional skills that will help him easily reintegrate into society upon his release. *See* **Exhibit E:** Certificates. He has also worked in the recreation department at FCI Williamsburg for over six years, and helped deal with at least 1,300-1500 inmates. His supervisor at the facility has given him a tremendous review, stating that:

> Mr. Everett has done an amazing job doing what has been requested of him and even doing what hasn't been asked of him.. I have observed that

Mr. Everett is a patient man who cares about others and tries to help individuals as much as possible. He takes his work seriously and his work ethic is at an all time high…He has a great amount of respect for staff as well as fellow inmates. He hasn't received an incident report since he has been incarcerated here which speaks volumes of his character and direction for change. I believe Mr. Everett is a changed man from when he first came into this facility.

*See Exhibit E:* Certificates. This review clearly speaks to the changed man Mr. Everett is and how deserving he is of a chance to remove himself from the dangers of prison during the COVID-19 pandemic, and to care for his mother and his children as a responsible man in society. A reduction or modification of Mr. Everett's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the heightened risks faced by Mr. Everett if his detention continues, whose ability to engage in basic self-protective measures is restricted, warrant relief. Mr. Everett's period of supervised release awaiting him will ensure that he complies with the release plan discussed with his family. *See United States v. Early*, 2020 WL 2112371, at *5 (N.D. Ill. May 4, 2020) (finding that the risk to the public "does not outweigh the risk to [Early] from contracting the coronavirus while incarcerated," particularly where "the Probation Office and the Court will be monitoring him while on supervised release and []the Court will not hesitate to recommit him to prison should he again go astray.") The Court may also impose home confinement for a term equivalent to the remainder of his custodial sentence as well. 18 U.S.C § 3582(C)(1)(A). *See also United States v. Raia*, No. 2:18-CR-657, Dkt. No. 91 (D.N.J., May 7, 2020). Considering all of these emergency circumstances, this Court could find a

combination of supervised release and/or home confinement which would be sufficient to ensure deterrence, and protection of the public.

## CONCLUSION

It is respectfully submitted that Mr. Everett has demonstrated extraordinary and compelling reasons for compassionate release. Moreover, the 18 U.S.C. Section 3553(a) factors tremendously weigh in favor of compassionate release as well. Thus, it is respectfully requested that this Honorable Court reduce his sentence to time served and/or add a period of home confinement as a condition of supervised release.

Respectfully submitted, this the 3rd day of August 2021.

GUIRGUIS LAW, PA

/s/ Nardine Mary Guirguis
Nardine Mary Guirguis
434 Fayetteville St., Suite 2140
Raleigh, North Carolina 27601
Telephone: (919) 832-0500
Facsimile: (919) 246-9500
nardine@guirguislaw.com

*Designation: CJA Appointed*

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the Assistant

Attorney for the United States electronically at the following address:

        Evab Rikyhe
        Attorney for the United States
        United States Attorney's Office
        Civil Division
        150 Fayetteville St.
        Suite 2100
        Raleigh, NC 27601
        Evan.Rikhye@usdoj.gov

This 3rd day of August 2021.

        GUIRGUIS LAW, PA

        /s/ Nardine Mary Guirguis
        Nardine Mary Guirguis
        PANEL Attorney

23